Gene Little et al., Appellees, v. Chicago Woman's Bowling Association, Inc. et al., Appellants.
Chicago Woman's Bowling Association, Inc. et al., Appellants, v. Gene Little et al., Appellees.

Gen. No. 44,325.

Opinion filed March 1, 1949. Released for publication April 26, 1949.

CHARLES V. FALKENBERG, of Chicago, for appellants.

NELSON, BOODELL & GRANT, of Chicago, KARL C. WILLIAMS, of Rockford, and MICHAEL J. DUNN, of Milwaukee, Wis., for appellees.

MR. JUSTICE FRIEND delivered the opinion of the court.

Gene Little, as a purported member of the Chicago Woman's Bowling Association, Inc., an Illinois corporation organized not for profit (hereinafter designated by the initials CWBA), individually and claiming to represent others similarly situated, filed a complaint in equity against CWBA and Mary R. Clesse, Marge Earley, Louise Le Grand and Betty E. Ramsey, its elected officers, seeking to enjoin defendants from holding a membership meeting of said association, at which, it was alleged, the individual defendants proposed to amend CWBA's constitution or by-laws to enable the association to withdraw from affiliation with Woman's International Bowling Congress and Illinois Woman's Bowling Association (hereinafter referred to as WIBC and IWBA, respectively); to enjoin defendants from disposing of funds allegedly belonging to WIBC and IWBA; from holding themselves out as officers of CWBA; for an accounting of all monies collected by defendants subsequent to August 1, 1945; and for other relief. A temporary injunction was issued without notice and without bond. After motion to dismiss the complaint was denied, defendants answered and filed a counterclaim against WIBC and IWBA, their officers and executive board, and against plaintiff and four co-appointee officers of CWBA, asking that WIBC, IWBA and their officers and all appointed officers be restrained from collecting twenty-five cents from each CWBA member as yearly dues; from violating the rules, by-laws and constitution of the several organizations by election, suspension and appointment of officers, and from spending monies belonging to such organizations; and they asked to have set aside all wrongful action by these associations and their officers, for an accounting and other relief. Numerous pleadings were filed by defendants and counter-claimants, including various petitions from time to time, and ex-

tensive interrogatories, a discussion of which is not essential to a determination of the issues involved. The cause was then referred to a master in chancery, before whom approximately 1,000 pages of testimony were adduced, and numerous exhibits introduced in evidence. At the conclusion of the hearing the master prepared and filed a comprehensive report consisting of 53 typewritten pages, finding against plaintiff on all material issues, and making specific recommendations to the chancellor for the entry of a decree in favor of defendants. The chancellor overruled practically all these findings and recommendations, and entered a decree in favor of plaintiff, from which this appeal is taken.

It appears from the evidence that an association, known as Woman's National Bowling Association, so-called predecessor of WIBC, was organized on November 29, 1916 by women who had attended a championship tournament in St. Louis, and on October 26, 1917 a constitution and by-laws were adopted. Whether this organization was abandoned or dissolved does not appear of record, but the master found and the evidence discloses that incorporation of WIBC in Illinois was undertaken and effected by officers of the Woman's National Bowling Association on April 6, 1925, and subsequently approved by its members in annual convention. IWBA was not organized until February 1930. CWBA, on the other hand, was formed as an Illinois corporation, not for profit, February 28, 1918, prior to the incorporation of either WIBC or IWBA.

Each of these associations has a constitution, by-laws, rules and regulations, salient excerpts from which are set forth in detail by the master. The principal object of their organization is to conduct bowling tournaments, for which WIBC issues sanctions. Membership in WIBC is annual. Members bowl on teams and leagues which are organized each year on and after August 1, the beginning of the fiscal year or bowl-

ing season. These leagues disband annually, and membership in the national and local associations ceases on the following July 31. Each association must apply at the beginning of every season for a sanction from WIBC. This is in the nature of a license, and when the sanction is granted the local association is then the duly constituted local unit for the year, covered by the sanction. Membership dues are fifty cents per year, as specified in the constitutions of the WIBC and CWBA, and where membership in the IWBA is included the annual dues are seventy-five cents, each of the associations being allocated twenty-five cents of these amounts.

Prior to 1944 the members of these associations worked in apparent harmony. Early signs of discord began to manifest themselves in February of that year at the Springfield convention of the IWBA, where the question of compulsory state dues was affirmatively voted upon. After the Springfield convention the Joliet Woman's Bowling Association brought action against the state association to enjoin the collection of state dues. After suit had been filed their attorneys held a conference, at which it was agreed that because of failure to serve proper notice preceding the Springfield convention, the matter would be voted on in the 1945 convention of IWBA, to be held in Bloomington. Thereafter, in December 1944, Grace Smith, as secretary of the IWBA, gave notice to the secretaries of all city associations in Illinois that the matter of compulsory state dues would be voted on at Bloomington on February 17, 1945. When the matter of state dues was first brought to the attention of the convention of IWBA at Bloomington on that date, a request was made to pass the matter, pending the arrival of interested members who had been delayed, principally from Joliet and Chicago. The request was denied. Mrs. Jeannette Knepprath, president of the WIBC, was present on the platform and addressed

the delegates, advocating compulsory state dues, following which a vote was taken on that question, and carried. At that time no amendment to the constitution was presented or discussed. However, subsequently, at the same meeting, a general revision thereof was considered, paragraph by paragraph, and the amendment to make effective compulsory state dues was voted upon by ballot and rejected.

In August 1945, the WIBC, through its secretary, prepared and mailed to the officers of all affiliated city associations in the State of Illinois, including CWBA, a letter advising them that compulsory state dues must be collected from all members of city associations in Illinois, and later in a letter dated December 31, 1945, reaffirmed its position in that regard. The individual defendants Clesse, Earley, Le Grand and Ramsey, as officers of the CWBA, refused to collect compulsory state dues for IWBA for 1945–1946. This incident was the forerunner of the breach that followed.

It appears that during the years 1943–1945 the Federal Office of Defense Transportation requested that no conventions or large gatherings be held, and for that reason no tournaments of WIBC were carried on. In 1943 the persons elected as delegates to WIBC convention, numbering more than 300, met at Chicago, in a so-called "war conference," but no legislative matters of WIBC were considered. In 1944, persons elected as delegates to the WIBC convention, numbering 340, met at Indianapolis, Indiana in another so-called "war conference," but again no legislative matters of WIBC were considered. In 1945, no meeting of delegates was held, but proposed legislation affecting amendments to the constitution, by-laws and rules of WIBC was submitted to delegates by a mail ballot, and the results of the ballot announced at an executive meeting of WIBC on May 27, 1945. The so-called "alley-woman" rule was adopted by the mail ballot as an amendment to the by-laws of WIBC. This

rule prohibited more than one so-called "alley-woman" (professional bowler) from bowling on any team.

The Year Books of the WIBC contained certain rules and regulations of the American Bowling Congress as having been adopted by the WIBC, relating principally to playing and scoring the game of ten pins. One rule related to barring from tournaments of WIBC all individuals or teams participating in world championships not sponsored by WIBC. These changes in rules were not submitted to the delegates of WIBC, and were never formally adopted by them, but the American Bowling Congress rules had always been automatically included in the Year Books of WIBC as a matter of policy to insure uniformity in the matter of playing the game of ten pins. The adoption of the "alley-woman" rule and the mail vote taken on constitutional and by-law amendments provoked further discord among these associations.

An additional incident occurred in July 1945, when Betty Ramsey, secretary of the CWBA, received a letter from one of its members requesting that a meeting of that association be held, and pursuant to that request a notice was mailed calling a special meeting of the executive board of CWBA to be held in Chicago on July 26, 1945. The executive board consisted of the officers of the CWBA and presidents of all city leagues bowling under its auspices or as members of the CWBA, which at that time numbered about 780. Although not members of the CWBA or its executive committee, Jeannette Knepprath, president of the WIBC, and several other of its officers and executive members attended that meeting and demanded the right to be seated because of their official positions as WIBC officers and executives. Immediately upon the convening of the meeting a motion was made, seconded and carried that the executive board of CWBA go into executive session, and thereupon Mary Clesse, its president, asked all who were not members of that organi-

zation to leave the room. After considerable discussion and argument, Jeannette Knepprath and other officers of the WIBC reluctantly retired. Defendants say that the WIBC officers were not invited and were trespassers who forced themselves into the meeting with the avowed purpose of "laying down the law to the CWBA's Executive Board members and dominating the meeting, just as they had dominated the meeting of the IWBA in 1945 which adopted the so-called compulsory dues regulation and just as the record shows they have for 20 years dominated every annual convention of the WIBC and as they attempted to dominate the October 13, 1945 round table conference at the Hotel Morrison which the suspended officers [of CWBA] attended." At any rate, when the meeting proceeded to business, a roll call of officers was held. The letter requesting the calling of the meeting, and the communication sent to the presidents of all sanctioned leagues calling the meeting, were read. Following a lengthy discussion a resolution was passed urging the executive board of CWBA to call a meeting of its membership, where the withdrawal of CWBA from membership in the WIBC would be recommended and considered. At the same meeting a motion was passed directing the secretary of CWBA to collect fifty-cent dues from each member and not to remit any part thereof to the WIBC pending the action of the membership committee.

Following the foregoing meeting Betty Ramsey, on August 4, 1945, mailed a letter to the secretaries of the various leagues of CWBA, explaining the collection of dues and stating that one-half of the amount collected would be held in escrow in accordance with the resolution of the executive board passed at its meeting on July 26, 1946. Subsequent thereto, approximately 14,000 women bowlers of Chicago paid Betty Ramsey dues for the CWBA, and several hundred indicated in writing their desire that the money paid was to be handled in accordance with that resolution.

Reprisals followed. On July 31, 1945, Jeannette Knepprath, president of WIBC, sent a letter to Mary Clesse, president of CWBA, and to its other officers, notifying them that they had been suspended for cause from WIBC. After receipt of this letter they nevertheless continued to act as officers, and ignored the notice as being illegal and as not affecting their positions as elected officers of CWBA, and continued in possession of the books, records and assets of their association. Following the receipt of the letter of suspension, Betty Ramsey wrote to Emma Phaler, secretary of WIBC, asking for a copy of the complaint filed against her, to which she received a reply advising that no complaint was on file, and suggesting that she write to Mrs. Knepprath about it. It is conceded that no specifications of charges or grounds for suspension were filed prior to the purported suspension. In September 1945, Emma Phaler, as secretary of WIBC, mailed a letter to all bowling league officials in the Chicago territory, stating that Clesse, Earley, Le Grand, Ramsey and Ehrns had been suspended by order of the president of WIBC from membership in WIBC, and were therefore ineligible to hold office in the CWBA, at the same time advising that no payments of dues were to be made to them, and directing them to turn over the property of CWBA to those appointed to succeed them. Still later, on September 27, 1945, Mrs. Phaler, secretary of WIBC, mailed a letter to Mrs. Ramsey, advising her that a meeting of the executive committee would be held in Chicago on October 6, 1945, at which her suspension of July 31, 1945 would be considered, requesting her attendance and offering the opportunity to present evidence. Later, a letter was mailed to Mrs. Ramsey, postponing that meeting. In the interim, on October 1, 1945, Mrs. Clesse, president of CWBA, wrote to Mrs. Phaler, protesting the nature of the letter of September 27, and setting forth conditions under which she would participate in the meeting called for October 13. A copy of that letter was sent to Mrs.

Knepprath. On October 9, 1945, Mrs. Knepprath wrote to Mrs. Clesse that they would be happy to allow a general discussion in the meeting of the 13th. On that date a meeting of officers and executive committee members of the WIBC and persons to whom Mrs. Knepprath had sent letters of suspension, was held in Chicago. The master reported that much wrangling ensued over methods of procedure and irrelevant matters. No charges were presented, nor was there any orderly presentation of evidence warranting suspension, and no evidence submitted in rebuttal. He further reported that the meeting was not conducted in accordance with the by-laws of the WIBC relating to grievances. Following this meeting Mrs. Phaler on October 27, 1945, notified Mrs. Ramsey by letter that she had been expelled from membership in the WIBC by order of the executive committee. No hearing was ever held on the suspension of Clesse, Earley, Le Grand, Ramsey, or the expulsion of Ramsey, in accordance with the by-laws of the WIBC.

Late in 1945, Mrs. Phaler sent letters to the many thousands of bowlers in Chicago who were members of CWBA and WIBC in 1944–1945, attempting to evaluate and decide the questions in controversy between the WIBC and the suspended officers of CWBA, and explaining the position of WIBC with respect to state dues, the mail vote and the purchase of *The Woman Bowler,* a magazine which had theretofore been owned and published by an individual who was about to discontinue its publication, and which was taken over by WIBC.

On August 8, 1945, Mrs. Knepprath, as president of WIBC, sent letters of appointment in the CWBA to the following persons: Gene Little, as president; Mae E. Hardenstein, as vice president; Marrian Drebing, as secretary; Carolyn Lueder, as treasurer; and Dorothy Miller, as sergeant at arms. Mrs. Knepprath advised them that such appointments were made without any

action being taken by the CWBA, and were to be effective until a meeting of CWBA was held. It appears that Marrian Drebing, the appointed secretary, collected seventy-five cent membership dues from approximately 9100 members in 1945–1946, remitting one-third of the collection to IWBA, one-third to WIBC and retaining or turning over to Carolyn Lueder, the appointed treasurer, the remaining one-third. The appointed officers of the CWBA, since August 1, 1945, have not formed any city associations.

On October 11, 1945, Mrs. Ramsey, as secretary of CWBA, mailed notices, to all bowlers who had paid her the sum of fifty cents as dues for the year 1945–1946, of a membership meeting to be held on October 18, 1945, and later she mailed notices to all who had paid dues after October 11, 1945 and before October 18. Such notices were not mailed to those bowlers who paid dues to the appointed officers, and it was not intended to mail such notices to any persons other than those on the list of names available to Mrs. Ramsey as those who had paid dues to her. Admission to the meeting was by identification through presentation of the notices mailed and also any person who had paid Mrs. Ramsey fifty cents at or prior to the meeting was to be admitted to the meeting. The notice stated that the business would be ''consideration of constitutional and by-law changes. Action will be taken on the resolutions of withdrawal, appointment of new standing and special committees.'' Thereafter, on October 18, at the instance of Gene Little and those whom she purported to represent, the court entered an order in this proceeding enjoining any changes of the constitution or by-laws of CWBA or the withdrawal of its individual members from membership or association in the WIBC by motion or resolution at the meeting of October 18, 1945, or any other date.

The detailed recital of the foregoing incidents and events is made necessary by the lengthy record pre-

sented and the numerous contentions made. The events related, following one upon the other and ultimately resulting in the suspension of officers of CWBA and the appointment of others, without consulting the membership and apparently not authorized by any provisions of the constitution or by-laws of any of these organizations, resulted in measures calculated to effect the withdrawal of CWBA from its working agreement with WIBC and the ultimate filing of these proceedings.

The gravamen of plaintiff's contention is that WIBC is the *supreme* or *parent* body, that CWBA and IWBA are *subsidiary, auxiliary* and *subordinate* affiliates, and as such are bound by WIBC rules which cannot be revoked or annulled by officers of the local associations, and plaintiff says that CWBA had no right to secede from WIBC without the approval of both associations, notwithstanding the attempted domination by WIBC as indicated by the related events. Whether plaintiff's position is sound depends upon the structural relation between these various organizations. The master made a careful analysis of the salient provisions of the constitutions of CWBA, IWBA and WIBC relating to organization and individual membership which is substantiated by the record. Article III, section 1 of the constitution of all three organizations contains the identical provision that each respective organization "shall be the supreme body in bowling affairs in matters pertaining to its organization, and it shall be a representative, legislative and executive body." Article II of both the CWBA and IWBA constitutions provides that the respective associations are formed for the following objects and purposes: "Sec. 1—To unite in a central organization all qualified bowlers in [the City of Chicago, in the case of CWBA, and in the State of Illinois in the IWBA constitution], and it shall be *subsidiary* and *auxiliary* to the Woman's International Bowling Congress, Inc., and the Constitution, Rules

and Regulations of the W₄ I. B. C. shall, *subject to the provisions of this Constitution,* govern this organization." (Italics ours.) With respect to WIBC, article III, section 2 of its constitution provides: "The WIBC shall sanction City and State Associations. . . . Each City and State Association sanction application must be accompanied by a fee of $1.00 . . . to cover the City and State tournament sanction. . . . No Association sanctioned by the WIBC shall enact laws or by-laws which may in any way conflict with the Constitution and By-Laws as outlined by the Congress and printed in detail in the back of this book." Other provisions of the constitutions of CWBA and WIBC provide that the annual dues for membership shall be fifty cents, of which amount twenty-five cents is to be retained by the one association and twenty-five cents to be forwarded for membership in the other. Likewise, the IWBA constitution provides that annual dues for its members shall be twenty-five cents, and that members bowling in state tournaments must also be members of WIBC and the city association, if the same is sanctioned. In addition to these salient provisions, the respective constitutions provided for disciplinary measures, the lodging and hearing of grievances, management and organization representation at annual conventions, amendments, membership in the other organizations, proceedings and action relating to the adoption of compulsory state dues, and the duties of the respective officers.

Following this analysis the master found that "the powers of the President of the Woman's International Bowling Congress as to the . . . 'auxiliary and subsidiary' associations is limited by the provisions of the Constitution of the Woman's International Bowling Congress Constitution, granting her powers and prescribing procedure, and by the provisions of the Constitution and By-Laws of the three organizations establishing the relationship between the three associa-

tions and the power of the Woman's International Bowling Congress in regard thereto." He further found that the compulsory state dues did not become effective by the action of the 1945 convention of the IWBA; that the action of the officers of the WIBC in attempting to enforce collection through city associations was unwarranted and improper; that the mail ballot of the WIBC held in the spring of 1945 did not comply with the provisions of the constitution and by-laws in regard to amendments; and that the action of the officers of WIBC in attempting to make effective the results of the mail ballot as amendments, particularly the so-called "alley-woman rule," was unwarranted and improper. With respect to the executive board meeting of the CWBA on July 26, 1945, he found that the city association was faced with the dilemma of having a constitutional provision requiring the collection of fifty-cent dues, and demands by the officers of WIBC that they collect seventy-five cents, together with the unwarranted and improper attempts of officers of the WIBC to enforce the collection of compulsory state dues and to make effective amendments to the by-laws improperly passed; and he concluded that it was proper to submit the questions involved to the members of the CWBA in open meeting for their advice, and that a withdrawal by CWBA from WIBC, by means of lapse of membership or otherwise, would be a possible solution of the dilemma.

As to the right of suspension, the master found that the president of WIBC and its executive board did not have the right to suspend the officers of the city organization from membership in the WIBC without first complying with the provisions of the by-laws and constitution of WIBC relating to discipline and grievance, and that they had no right or power to expel them from membership in CWBA or to remove them as elected officers of that organization. As to the appointment of new officers, the master found that the president of

WIBC or its executive board had no right or power to appoint Gene Little et al., "and they are not and have not been officers of the Chicago Woman's Bowling Association by virtue of that purported appointment." He found that the meeting of the members of the CWBA called for October 18, 1945, had no power to amend the by-laws of the CWBA, since they had not been submitted in writing ten days prior to the annual meeting, as required by the by-laws, but there is uncontradicted testimony by several of the defendants that it was not their intention to adopt any amendments at the October meeting, but rather to discuss proposed changes, ascertain the consensus of its members and then arrange for presentation of amendments, if any, at the annual meeting in March.

Consonant with these findings the master made the following recommendations: (1) that the complaint be dismissed for want of equity; (2) that plaintiff Gene Little and counterdefendants May Hardenstein, Marrian Drebing, Carolyn Lueder and Dorothy Miller be permanently enjoined from holding themselves out as officers of the CWBA, performing any duties as such or collecting any monies as officers of said association; (3) that Gene Little and the counterdefendants be directed to account to the CWBA for all funds which they have collected as purported officers of CWBA, and to deliver to the elected officers of CWBA the funds so collected; (4) that the defendant CWBA be directed to enter on its roll and treat as members all persons for whom dues are turned over, as directed, for the respective years for which such dues were paid; (5) that the counterdefendants WIBC, its officers, directors and executives, be permanently enjoined from regulating or attempting to regulate, direct or manage the operation of the affairs of the CWBA, or attempting to collect compulsory state dues in Illinois from the members of CWBA; (6) that under the direction of the court, a meeting of the members of CWBA be held for

the purpose of submitting to them by ballot the question whether the individual dues of the members of the CWBA shall be tendered to the WIBC for the year 1946–1947, whether CWBA shall apply to WIBC for a city association sanction for the year 1946–1947, whether the dues collected by the elected officers of CWBA for the year 1945–1946 in excess of twenty-five cents, being funds now on deposit with the clerk of the superior court, be forwarded to the WIBC, or returned to those persons who contributed the funds, or returned to the treasurer of the CWBA; and that the defendants CWBA and its officers be directed to comply promptly with the result of such vote; (7) that the defendants Clesse, Earley, Le Grand and Ramsey be directed to submit to the members of CWBA at their next annual meeting such amendments to the constitution and by-laws which, if adopted, would make the constitution or by-laws conform with the will of the members, as expressed by the ballot taken at the meeting of the members held under the order of the court; (8) that the temporary injunction entered on October 18, 1945 be set aside and vacated; (9) that the funds heretofore deposited with the clerk of the superior court be returned to the treasurer of CWBA when the meeting of the members of CWBA has been called as directed, and that said funds be disposed of by the treasurer in accordance with the result of said ballot; and (10) that the counterdefendants IWBA, its officers, directors and executives be dismissed from the proceeding.

 Plaintiff stands on the legal propositions that "WIBC is the supreme body"; that CWBA and IWBA are subordinate affiliates, and as such are bound by the WIBC constitution and by-laws, which cannot be revoked or annulled by officers of the CWBA; that CWBA and WIBC, although individual corporations, were but one organization as to their rights, duties and obligations; and she seeks, by means of these legal propositions, to justify the conduct of the officers and

the executives of WIBC in respect to the events that provoked the controversy between these associations and led to the ultimate rupture. All through her brief plaintiff's counsel characterize WIBC as the *supreme* or *parent* body, and CWBA as a subsidiary, auxiliary and *subordinate affiliate*. From that premise they argue that jurisdiction of a supreme or grand lodge over those that are subordinate is in many respects analogous to that of certain ecclesiastical bodies over churches affiliated with them, and many of the cases cited are of that character. However, we find nothing in the provisions of the respective constitutions of the associations here involved which would warrant any such conclusion. As already indicated, CWBA was organized and functioning as an Illinois corporation before WIBC came into existence, and although they have through the years operated under a pact or agreement through which WIBC was given certain jurisdictional rights such as the granting of licenses to city organizations for holding bowling tournaments, there is nothing in the by-laws to indicate that CWBA ever subordinated itself to WIBC to the extent that it could not control its own affairs or sever its relations whenever its members elected to do so. The constitution of each of the three associations makes each one "the supreme body in bowling affairs in matters pertaining to its organization," and designates them as "a representative, legislative and executive body." The word "subordinate" is not used in the constitutions or by-laws of any of these associations, nor do any of their provisions connote the relationship of parent and subordinate body. The terms "subordinate" and "parent" are obviously used to bring WIBC within the class of cases upon which plaintiff relies.

Many of the decisions cited by plaintiff against the right of CWBA to secede from affiliation with WIBC relate either to ecclesiastical, fraternal, labor or trade associations. While we do not have before us the

charters, constitutions or by-laws of organizations like the Knights of Columbus, Order of Eastern Star, Order of Elks, Kiwanis, Rotary or Lion International, it is common knowledge that they are organized on an entirely different basis. Generally speaking, those organizations delegate, by issues of charter, limited rights or powers to subordinate lodges, units or clubs wherein the lodges, units or clubs *specifically agree, when accepting charters,* to exercise the limited rights bestowed upon them, and to be bound by the provisions of the constitutions and laws of the parent body. We recently had before us a typical case of this kind in *Morgan v. Local 1150, United Electrical, Radio & Machine Workers of America,* 331 Ill. App. 21 (Abst.). The defendant in that case was a local union affiliated with a national labor organization which was governed by a written constitution. Its affairs were administered by a general executive board, composed of officers elected annually by a convention to which all locals were permitted to send delegates according to the size of their membership. A local was empowered to adopt its own constitution and by-laws provided they did not conflict with the laws of the governing body, and a copy of its constitution was required to be submitted to the parent body for examination by the general executive board before it could become effective. In the case at bar we find nothing comparable to that type of organization. There is no "parent" body and no "subordinate" unit. CWBA is a separate corporation which, at most, has an affiliate relationship to WIBC but is subject to the provisions of its own constitution, and not a creature of WIBC, without its own sovereignty.

Most of the decisions cited by plaintiff involve the threatened secession of ecclesiastical or fraternal organization units which sought to take with them the money and property of the subordinate unit against the wishes of a minority or the parent body. For instance, in *Grand Court of Washington, F.O.A. v. Hodel,* 74 Wash. 314, 133 Pac. 438, the court held that a

majority of members of a *subordinate* court have no power to secede from the organization and take with them the money and property against the wishes of the minority. In *Sutter v. Trustees First Reformed Dutch Church,* 42 Pa. St. 503, the court denied the right of secession upon the principle that "every member of the congregation joined on the faith that the law instituted by that act of union was the law of this congregation in common with others. It follows, therefore, that the secession is a violation of that law, unless we can find some other authority for it that is superior to that law, or provides a mode by which the congregation may set it aside." In *Great Council, I.O.R.M. v. Mohican Tribe, No. 64, I.O.R.M.,* 92 N. J. Eq. 593, 114 Atl. 440, there appeared to have been an affiliation of the subordinate lodge with the national association. The court said that by this contract the members "had agreed and were obligated to be and continue an association, bound by all the terms and parts of that agreement, and bound by state statutes relative to associations; . . . . It would seem elemental that this contract could not be changed without the consent of all the members, unless there were some provision in the contract, or in the law of this state, providing for such change upon less than the consent of all, and under certain procedure and conditions."

The case principally relied on by plaintiff is *Winnetka Trust & Savings Bank v. Practical Refrigerating Engineers Ass'n,* 322 Ill. App. 154. The question there involved the right of the majority of an unincorporated association to withdraw from the "parent organization" and take with them the funds and property accumulated by the "subordinate body" and intended to be used by it in furthering the purposes of the parent organization. The court held that this could not be done, and in reaching the conclusion said that "The organization before us is similar in many respects to various religious denominations operating through unincorporated bodies, and should be governed

244

by substantially the same principles of law as control such bodies," citing the early case of *Ferraria v. Vasconcelles*, 23 Ill. 403, in which the court said that "After individuals or organized bodies have entered into a compact or agreement, it requires the assent of the contracting parties to abrogate the agreement, and no reason is perceived, on this principle, why a church which, by compact, has become a portion of the presbytery, should have the voluntary right to withdraw from the organization without mutual consent." The *Winnetka Bank* case quoted with approval from *Christian Church of Sand Creek v. Church of Christ of Sand Creek,* 219 Ill. 503, as follows: " 'When the members of a religious congregation divide and one faction breaks away from the congregation and forms a new organization, the title to the property of the congregation will remain in that part of the congregation which adheres to the tenets and doctrines orginally taught by the congregation to whose use the property was originally dedicated.' " The *Winnetka Bank* opinion does not show the structural relationship of the "unincorporated" associations there involved, upon which the analogy is made to ecclesiastical or church organizations, but we are convinced that the associations in the case at bar rest on a different basis. As indicated, CWBA was incorporated in 1918, before WIBC came into existence. It is a separate organization chartered by the State of Illinois. It has never subordinated itself to WIBC, but has acted as an affiliate under certain constitutional limitations which, in the absence of any provision to the contrary, include the right to withdraw and discontinue those affiliations as inherent in its power as a separate corporation. This right cannot be taken from it upon the theory enunciated in cases of ecclesiastical organizations, lodges and national trade associations.

In the light of these conclusions it becomes unnecessary to discuss the many other points raised by the

respective counsel. If the CWBA had the right by appropriate action to submit to its membership the proposed amendment which would have resulted in its secession from affiliation with WIBC, and to act independently in other respects, including the collection of dues for WIBC and IWBA, the injunction order was manifestly improper, and the decree of the chancellor overruling substantially all the findings and recommendations made by the master was erroneous.

Accordingly the decree of the superior court is reversed and the cause remanded with directions to enter a decree in accordance with the findings and recommendations of the master, in the light of membership conditions as they appear when the matter is presented to the court.

*Decree reversed and cause remanded with directions.*

SULLIVAN, P. J., and SCANLAN, J., concur.