SASHO V. AGLIKIN *et al.*, Plaintiffs-Appellees, v. CHRIST C. KOVACHEFF *et al.*, Defendants-Appellants.

First District (4th Division)   No. 85—2189

Opinion filed November 12, 1987.

JIGANTI, J., dissenting.

George W. Hamman and Dawn M. Cassie, both of Hamman & Benn, of Chicago, for appellants.

Sherman F. Jaffe, of Chicago, for appellees.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

This appeal involves a dispute between members of a local church. The dispute arose when the regional diocese dismissed certain church

members from their positions on the local church's board of trustees and appointed other church members to a commission to govern the local church. The regional diocese then ordered the former board members to deliver the church's assets and records to the newly appointed commission members. When the former board members refused, the newly appointed commission members filed an action for permanent injunctive and declaratory relief. Following cross-motions for summary judgment, the trial court ordered the local church's property and records turned over to the commission appointed by the regional diocese. It further ordered that the local church was "governed by the dictates" of the regional diocese. The former board members appeal. We reverse and remand.

BACKGROUND

Plaintiffs are members of a commission of the St. Sophia Bulgarian Orthodox Church in Chicago (St. Sophia). They were appointed to these positions by the Diocesan Mixed Council of the American-Bulgarian Eastern Orthodox Diocese of Akron, Ohio (the diocese), which includes Chicago and St. Sophia.

Defendants are the former president, secretary, and treasurer of St. Sophia's board of trustees. The diocese dismissed these former board members for reasons not pertinent here, and appointed the commission members to replace them. The diocese also ordered the former board members to deliver to the commission members all of St. Sophia's assets and records.

When the former board members refused to comply with the diocese's directions, the commission members appointed by the diocese filed a complaint in the circuit court of Cook County. As ultimately amended, the pleading sought a permanent mandatory injunction ordering the former board members to deliver St. Sophia's assets and records to the commission members. It also requested a declaration that St. Sophia, as an Illinois not-for-profit corporation, controls its records and assets, and that it is governed by the "dictates" of the regional diocese.

The parties filed cross-motions for summary judgment supported by documents and affidavits indicating the following information. St. Sophia was organized in 1938 and incorporated in 1946. Its articles of incorporation state that the church "administratively and canonically, is [an] inseparable organic part of the Bulgarian Eparchy in America and remains under its jurisdiction."

Regional diocese control over the board of a local church is provided for in the synod bylaws of the Bulgarian Orthodox Church of

Sophia, Bulgaria, dated 1951. These synod bylaws state that a regional diocese may dismiss local church board members, if they do not "perform devotedly and conscien[t]iously their duties," and appoint a commission to govern the local church. However, the synod bylaws also provide that the "organization and administration" of the American regional diocese is to be determined according to a special synodical order sanctioned by the Bulgarian Ministry of Foreign Affairs. No such order appears in the record before us.

The regional diocese was formed in 1969. Its bylaws state that each local church shall have "absolute control and titles [to] real estate and personal properties" and that the board of trustees of each local church administrates each parish. Although the diocesan bylaws state that the names of board members must be sent to the bishop of the diocese for "his blessing," they do not provide for any diocesan control of the board while it is in office.

The affidavit of the former president of St. Sophia's board of trustees, submitted by the former board members, indicated that in 1950, a representative of the Bulgarian Synod invited the local Bulgarian Orthodox Churches then existing in the United States to meet with him in New York for the purpose of forming an American diocese. Administrative independence was a central concern of the churches in attendance. The representatives of the local churches who remained at the 11-day meeting expressly reserved the right of their churches to administrative independence. According to the former board president's affidavit, that administrative independence of the local churches still continues.

The commission members submitted the affidavit of a member of the commission. He alleged in his affidavit that he attended a meeting at St. Sophia in 1974 in which the former board members, as well as other members of St. Sophia, participated. At the meeting it was the "firm understanding and agreement" of the majority to "firmly associate" St. Sophia with the Bulgarian Synod in Sophia, Bulgaria, and to be bound by its constitution and bylaws. Also, St. Sophia agreed to be controlled in all administrative as well as spiritual matters by the bishop of the regional diocese.

Following briefing and argument, the trial court entered summary judgment in favor of the commission members. In its order, the trial court held the former board members "permanently enjoined from interfering with the operation of St. Sophia's Church by [the commission members appointed by the regional diocese]." The court also ordered that the former board members "turn over all documents and assets of St. Sophia's Church currently in their possession to [the

commission members] and \*\*\* execute any and all documents necessary to effectuate the turn over of control of the funds on deposit at [a specified bank]."

In addition, the court's order "declared that the assets of the St. Sophia's Church are under control of the 'Bulgarian Orthodox Church, Saint Sophia' as incorporated in the state of Illinois." It further declared that "said corporation shall be governed by the dictates of" the head of the regional diocese. The former board members of St. Sophia appeal.

OPINION

■ The State has a cognizable interest in the peaceful resolution of internal church disputes which are concerned with control or ownership of church property, and the civil courts have general authority to resolve such controversies. (*Jones v. Wolf* (1979), 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025; see also *Bishop & Diocese v. Mote* (Colo. 1986), 716 P.2d 85, 90-91, *cert. denied* (1986), 479 U.S. 826, 93 L. Ed. 2d 52, 107 S. Ct. 102.) However, resolution of church property disputes by the civil courts is limited by the first amendment to the United States Constitution, which forbids State interference with the free exercise of religion. (See generally U.S. Const., amend. I; *Kedroff v. Saint Nicholas Cathedral* (1952), 344 U.S. 94, 113-16, 97 L. Ed. 120, 135-36, 73 S. Ct. 143, 153-54.) This constitutional limitation denies to civil courts the authority to resolve questions of church doctrine or policy. *Jones v. Wolf* (1979), 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025; see also *York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 615, 474 N.E.2d 716, *cert. denied* (1985), 474 U.S. 865, 88 L. Ed. 2d 152, 106 S. Ct. 183; *Grace Evangelical Lutheran Church v. Lutheran Church-Missouri Synod* (1983), 118 Ill. App. 3d 151, 155, *cert. denied* (1984), 469 U.S. 820, 83 L. Ed. 2d 38, 105 S. Ct. 91.

When doctrinal or polity issues arise in the determination of a property dispute, the courts must defer to the resolution reached by the church's highest ecclesiastical authority. (*Jones v. Wolf* (1979), 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025.) If the church is hierarchical, *i.e.*, the local church is a subordinate member of a general church organization, then a civil court's decision must defer to that of the general church. (*Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372.) If the church is congregational, *i.e.*, the local church is strictly independent of other ecclesiastical organizations, the civil court should defer to the decision of the local congregational governance. *Mary-*

*land & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.* (1970), 396 U.S. 367, 368-69, 24 L. Ed. 2d 582, 583-84, 90 S. Ct. 499, 500 (Brennan, J., concurring); *Watson v. Jones* (1872), 80 U.S. (13 Wall.) 679, 724-25, 20 L. Ed. 666, 675.

If doctrinal controversy is not involved, the first amendment does not require that the States adopt a rule of compulsory deference to religious authority in resolving property disputes. Instead, the State courts may choose from a variety of approaches. One of these, the neutral-principles approach, allows the court to apply objective legal principles to its examination of church documents and other pertinent evidence. In this manner the court determines who owns or controls church property in much the same manner that it would decide a secular property dispute. *Jones v. Wolf* (1979), 443 U.S. 595, 602, 605, 61 L. Ed. 2d 775, 784, 786, 99 S. Ct. 3020, 3025, 3026.

In the case at bar, the trial court employed the strict-deference approach to resolve the instant dispute. It found that the bishop of the regional diocese administers the local churches in the Bulgarian Eastern Orthodox Church and that the churches are subject to his decisions; therefore, the court reasoned, the commission appointed by the bishop should govern the church. Based upon this analysis, the trial court entered judgment in favor of the commission members appointed by the regional diocese.

█ We are persuaded that the neutral-principles analysis should be adopted to resolve church property controversies if, in such resolution, no doctrinal issues are involved. (See *Foss v. Dykstra* (S.D. 1982), 319 N.W.2d 499, 500; *cf., Bishop & Diocese v. Mote* (Colo.1986), 716 P.2d 85, 102-03.) Our preference for a neutral-principles approach, rather than the strict-deference approach, is based on our conclusion that court entanglement in ecclesiastical doctrine is less likely to occur in the application of neutral principles. See *York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 474 N.E.2d 716; *Bishop & Diocese v. Mote* (Colo. 1986), 716 P.2d 85, 102-03; *Foss v. Dykstra* (S.D. 1982), 319 N. W. 2d 499, 500.

We also observe that in employing the deference approach, a court may presume a local church has relinquished all power to a hierarchical body which may, in some instances, frustrate the actual intent or goals of the local church and deprive the local church of legal remedies that otherwise would or should be available to it. (*York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 617, 474 N.E.2d 716, quoting *First Presbyterian Church v. United Presbyterian Church* (1984), 62 N.Y.2d 110, 121, 464 N.E.2d 454, 460, 476 N.Y.S.2d 86, 92, *cert. denied* (1984), 469 U.S. 1037, 83 L. Ed. 2d 404,

105 S. Ct. 514.) As *York* notes, such a rule may result in discouraging local churches from associating themselves with other churches and thereby infringe upon the free exercise of religion. (*York*, 130 Ill. App. 3d at 617.) "Strict deference is oblivious to the tension between ensuring total autonomy to religious societies, its apparent goal, and affording members of those societies the legal remedies normally available to attack unauthorized 'management' actions." Ellmann, *Driven From the Tribunal: Judicial Resolution of Internal Church Disputes*, 69 Cal. L. Rev. 1378, 1403 (1981), citing L. Tribe, American Constitutional Law 881-85 (1980).

Adherence to the strict-deference approach is not always counseled by the first amendment. According greater deference to the decisions of a hierarchical religious association than to the decisions of comparable voluntary secular associations on similar questions may, in avoiding interference with the free exercise of religion, create more complex problems under the establishment clause. *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 734, 49 L. Ed. 2d 151, 177, 96 S. Ct. 2372, 2392 (Rehnquist, J., dissenting); see also Adams & Hanlon, *Jones v. Wolf: Church Autonomy and the Religion Clauses of the First Amendment*, 128 U. Pa. L. Rev. 1291, 1338 (1980).

In light of these considerations and the parties' agreement that resolution of this dispute does not turn on doctrine or polity, we conclude neutral principles should be applied to the case at bar. As a general rule, neutral principles may be applied to two types of church property disputes: ownership disputes and control disputes. In church ownership disputes, a court may decide whether property belongs to the local church or general church by reference to "objective, well-established concepts of trust and property law." (*Jones v. Wolf* (1979), 443 U.S. 595, 603, 62 L. Ed. 2d 775, 785, 99 S. Ct. 3020, 3025.) In control disputes, where the local congregation is itself divided into conflicting factions, the courts may determine which faction controls the property, without infringement upon first amendment rights, by consulting the "well-established principles of statutory and common law traditionally applied to determine who has legal control over any particular corporation or voluntary association and how freely or extensively that control can be exercised." (*Bishop & Diocese v. Mote* (Colo. 1986), 716 P.2d 85, 100; see generally, *e.g.*, *Little v. Chicago Woman's Bowling Association, Inc.* (1949), 337 Ill. App. 226, 84 N.E.2d 690, *appeal denied* (1949), 403 Ill. 628.) The case at bar is a control dispute, a controversy among the members of a local church over the control of property.

■ Based upon our review of the record, we determine that the documents and affidavits submitted by the parties present a genuine issue of material fact regarding the authority of the commission members appointed by the diocese. The articles of incorporation of St. Sophia state that the local church is "administratively and canonically" under the "jurisdiction" of the regional diocese. However, St. Sophia's incorporating document does not specify the scope or extent of any "administrative jurisdiction" of the regional diocese over the local church with respect to control of church property, or, more particularly, the authority of the diocese to dismiss board members and appoint a commission to replace them.

In addition, the bylaws of the regional diocese do not provide for any "administrative jurisdiction" of the regional diocese over a local church's property. In fact, the diocesan bylaws indicate that a local church's board of directors administrates each parish, and that each local church has "absolute control and titles [to] real estate and personal properties" of the local church. The synod bylaws of the Bulgarian Church offer no guidance, since this record contains no special synod order regulating American diocesan administration of local churches. Similarly, the parties' affidavits dispute the extent of St. Sophia's subordination to the regional diocese.

■ Viewing these facts in the light most favorable to the former board members, we cannot find that, as a matter of law, St. Sophia subordinated itself to the diocese, such that the regional diocese was accorded the authority to dismiss the board members of the local church and appoint commission members to serve in their stead. (See generally Ill. Rev. Stat. 1985, ch. 110, par. 2—1005; *Harris Trust & Savings Bank v. Joanna-Western Mills Co.* (1977), 53 Ill. App. 3d 542, 368 N.E.2d 629.) The articles of incorporation and bylaws are not conclusive regarding the issue of corporate control, nor do the affidavits establish clearly whether or not an agreement was made by the local church to subordinate itself to the regional diocese. (See generally, e.g., *Little v. Chicago Woman's Bowling Association, Inc.* (1949), 337 Ill. App. 226, 242, 84 N.E.2d 690.) Moreover, because the trial court failed to apply neutral principles in reaching its decision, we remand the cause in order to adequately assure that an opportunity has been afforded for the court's full consideration of all evidence and for the findings of facts relevant to a neutral-principles analysis. See *Foss v. Dykstra* (S.D. 1982), 319 N.W.2d 499, 500; *cf. Bishop & Diocese v. Mote* (Colo. 1986), 716 P.2d 85, 102-03.

Therefore, the entry of summary judgment is reversed and the cause remanded for further proceedings to determine whether the

commission members are entitled to control the assets and records of St. Sophia. On remand, absent the submission of an additional organizational document that establishes the commission members' legal right to control St. Sophia's records and assets, the court should weigh the conflicting testimony regarding the alleged oral subordination agreement between the local church and regional diocese and any evidence of prior construction or interpretation given by St. Sophia to provisions regarding control in its organizational documents. See generally *Voss v. Lakefront Realty Corp.* (1977), 48 Ill. App. 3d 56, 365 N.E.2d 347, *appeal denied* (1977), 66 Ill. 2d 637; *Little v. Chicago Woman's Bowling Association, Inc.* (1949), 337 Ill. App. 226, 84 N.E.2d 690.

■ We note that the trial court impermissibly extended its jurisdiction by declaring that St. Sophia will be "governed by the dictates" of the bishop. While the civil courts have subject matter jurisdiction over church property disputes, they may decide only issues relating to the parties' civil and property rights. (*Ginossi v. Samatos* (1954), 3 Ill. App. 2d 514, 525-26, 123 N.E.2d 104; see also *Jones v. Wolf* (1979), 443 U.S. 595, 609, 61 L. Ed. 2d 775, 788, 99 S. Ct. 3020, 3028; *York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 618-19, 474 N.E.2d 716.) By according the bishop plenary authority over St. Sophia's affairs, the trial court failed to restrict itself to deciding who controls St. Sophia's property and assets. Civil courts lack the power to confer ecclesiastical authority. *Jones*, 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020.

We also observe that another portion of the trial court's order enjoins the former board members from "interfering" with the commission members' "operation" of St. Sophia. While there is support for the court's use of its equitable powers to maintain order between the factions of a church (see *Atteberry v. Smith* (1987), 104 Pa. Commw. 550, 554-55, 560, 522 A.2d 683, 685, 688), we caution that such broad and ambiguous language as was adopted by the trial court here may abridge the establishment clause of the first amendment.

For the reasons stated, the order of the trial court is reversed and the cause remanded to the circuit court of Cook County for further proceedings consistent with the views expressed herein.

Reversed and remanded.

JOHNSON, J., concurs.

JUSTICE JIGANTI, dissenting:

I must respectfully dissent from the opinion of the majority because I believe that application of neutral principles of law to the case at bar supports the trial court's grant of summary judgment to the plaintiffs.

As recognized by the majority, this case presents a substantial underlying question of how a religious dispute over property should be resolved. More particularly, must the court defer to the ruling of the highest authority in a hierarchical church or may the court determine the dispute in another way? This question was addressed as follows by the United States Supreme Court in *Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020:

> "[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.] Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' *Maryland & Va. Churches*, 396 U.S., at 368 (Brennan, J., concurring) (emphasis in original)." (*Jones v. Wolf* (1979), 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025.)

Thus, the *Jones* court recognized that in matters of church doctrine or polity, civil courts must utilize the "strict-deference" approach. However, in matters involving ownership and control of church property where no inquiry into religious doctrine is necessary, a State may decide the dispute based on "neutral principles of law." The Court observed that the "neutral-principles" approach employs "objective, well-established concepts of trust and property law familiar to lawyers and judges." (443 U.S. at 603, 61 L. Ed. 2d at 785, 99 S. Ct. at 3025.) The *Jones* case contained a strong dissent by four members of the Court who argued that the neutral-principles approach would nonetheless have the effect of involving the courts in religious disputes.

The neutral-principles approach was adopted in Illinois in *York v. First Presbyterian Church* (1984), 130 Ill. App. 3d 611, 474 N.E.2d 716. The court observed that in applying the neutral-principles approach, courts will examine such evidence as the language of a deed,

the terms of a local corporate charter, State statutes applicable to church property and relevant provisions of the church constitution and laws. Following the decisions in *Jones* and *York*, the majority in the instant cause adopt the neutral-principles approach. I agree that applying neutral principles of law is the correct approach.

I disagree, however, with the majority's conclusion that application of neutral principles of law to the facts of the instant cause reveals a genuine issue of material fact sufficient to preclude an award of summary judgment in favor of the plaintiffs. In deciding the cross-motions for summary judgment, the trial court had before it the articles of incorporation of St. Sophia, the bylaws of St. Sophia, the constitution-bylaws of the regional diocese, the bylaws of the Bulgarian Orthodox Church in Bulgaria and certain affidavits.[1] The articles of incorporation of St. Sophia provide that St. Sophia "administratively and canonically is [an] inseparable organic part of the Bulgarian Eparchy[2] in America and remains under its jurisdiction." The regional diocese created by the Bulgarian Orthodox Church is located in Akron, Ohio, and is under the jurisdiction of the Bulgarian Orthodox Church. The bylaws of the Bulgarian Orthodox Church provide that the regional diocese may dismiss local church boards when they do not perform their duties devotedly and conscientiously and may adopt a four-person commission having all the rights and duties of the church board. That is exactly what transpired in the case at bar. The regional diocese removed the defendants as directors of the church and appointed the plaintiffs as the commission assuming the rights and duties of the church board. The only issue in this case is whether St. Sophia submitted to the jurisdiction of the regional diocese and the Bulgarian Orthodox Church. Although the majority finds a question of fact with regard to this issue, I believe that it is foreclosed by the statement in St. Sophia's articles of incorporation that St. Sophia was "administratively and canonically" under the jurisdiction of the "Bulgarian Eparchy in America."

The rules for construing the articles of incorporation are the same

---

[1]Although the majority comments that the trial court employed its strict-deference approach, I am unable to determine how the majority reaches that conclusion. The only rationale I can discern is that because the trial court ruled in favor of the plaintiffs appointed by the regional diocese and against the local church, it must have used the strict-deference approach. In my judgment, it could be equally well concluded that since the court had before it all the necessary documents, that the judgment was reached using neutral principles of law.

[2]Eparchy is defined in Webster's dictionary as meaning diocese. Webster's Third New International Dictionary 761 (1981).

as the rules for construing statutes and contracts and other private writings. (19 C.J.S. *Corporations* §948(a) (1940).) Construction of a contract is a question of law and the court must determine the construction from the document's clear language. (*Vigilante v. National Bank* (1982), 106 Ill. App. 3d 820, 823, 436 N.E.2d 652.) It is the plain meaning of the words used in the contract that govern the interpretation. (*Donaldson v. Gordon* (1947), 397 Ill. 488, 74 N.E.2d 816.) The wording of the articles of incorporation of St. Sophia is clear: St. Sophia is "administratively and canonically" an inseparable part of the Bulgarian Eparchy in America and "remains under its jurisdiction." The fact that the articles also give St. Sophia the responsibility of building its own church, securing its priests and developing a school and cemetery in no way contradicts the clear statement that the church was to be bound through the hierarchy to the regional diocese and ultimately the Bulgarian Orthodox Church.

In support of its conclusion that there exists a question of fact on the issue of whether St. Sophia submitted to the jurisdiction of the Bulgarian Orthodox Church and its regional diocese, the majority relies on the bylaws of St. Sophia. These bylaws provide that the administration of St. Sophia is to be within the executive committee and the board of directors of the local church and that the committee is to control the real estate and other property of the parish, to determine the salary of the priests and to otherwise deal in property. The bylaws further state that no member of an executive committee of any other organization shall serve as a member of the executive committee of St. Sophia. The majority also relies upon the bylaws of the regional diocese, which provide that each local church has "absolute control and titles [to] real estate and personal properties" and that the board of trustees of each local church administrates each parish.

In my view, neither the bylaws of St. Sophia nor the bylaws of the regional diocese can properly be interpreted as coming into conflict with St. Sophia's articles of incorporation on the issue of whether St. Sophia submitted to the jurisdiction of the regional diocese and the Bulgarian Orthodox Church in matters of administration. The fact that the regional diocese, as an arm of the church hierarchy, can replace the executive committee and board of directors of St. Sophia does not mean that control of the church property no longer rests in St. Sophia. St. Sophia will still operate as St. Sophia, but under a new leadership. Furthermore, if the bylaws did in some way conflict with the clear wording of the articles of incorporation, the articles would control. Illinois law provides that the bylaws of a corporation may

contain any provisions for the regulation and management of the affairs of the corporation not inconsistent with law or the articles of incorporation. (Ill. Rev. Stat. 1983, ch. 32, par. 157.25; *Westlake Hospital Association v. Blix* (1958), 13 Ill. 2d 183, 148 N.E.2d 471.) The only inconsistency remaining, then, concerns the affidavits. Again, in my view the affidavits cannot prevail over the clear statements contained in the articles of incorporation.

For the foregoing reasons, I would affirm the judgment of the trial court.