Mark Ginossi, Foto Gjerko, Vito Nako, and Thanos Titos, Appellants, v. George Samatos et al., Appellees.

### Gen. No. 46,170.

515

516

Opinion filed October 19, 1954. Released for publication January 4, 1955.

WACHOWSKI & WACHOWSKI, of Chicago, for appellants; CASIMIR R. WACHOWSKI, and WILLIAM M. DAEMICKE, both of Chicago, of counsel.

WILLIAM D. BELROY, and G. A. BOSOMBURG, both of Chicago, for appellees; G. A. BOSOMBURG, of Chicago, of counsel.

MR. JUSTICE ROBSON delivered the opinion of the court.

The parties to this controversy were, until recently, members and officers of one church, St. Nicholas of Chicago. A dispute arose among the members and officers as to whether the church would remain affiliated with the Albanian Orthodox Diocese in America, Boston, Massachusetts, of which the Rev. Fan Stylian Noli is the bishop, or whether the church would be placed under the ecclesiastical jurisdiction of the Albanian Orthodox Episcopacy, Boston, Massachusetts, affiliated with the Holy See at Constantinople, Patriarchate of all Eastern Orthodoxy, of which the Rev. Mark Lipa is the bishop. On March 16, 1952, by a vote of 120 to 2

the membership of the church amended the by-laws so that in the future they would be affiliated with and recognize Bishop Lipa rather than Bishop Noli, who is considered to be controlled by the procommunist regime in Albania.

Plaintiffs, officers of the church representing the pro-Bishop Noli group, a minority of the membership, filed their complaint on behalf of themselves and all other members of St. Nicholas Church. Plaintiffs seek to restrain the defendants, who are a part of the majority, from transferring possession or control of the church building, or any of its assets, or from interfering with the conduct of religious services by Father Dode, or from interfering with or preventing Vito Nako or Thanos Titos from acting as members of the board of directors. Defendants answered, denied the complaint's allegations and filed their countercomplaint, in which they were joined by 110 or more members of the church. They pray that the plaintiffs be restrained from interfering with the operation of the church and use of its property, that the action of the board purportedly dismissing certain officers and members of the church be held null and void and the meeting amending the constitution and by-laws of the church be declared proper and legal. The court referred the cause to a master who after extensive hearings filed his report recommending that the relief prayed for in the countercomplaint be granted. Plaintiffs filed objections to the master's report which were overruled and allowed to stand as exceptions. The court after a hearing on the exceptions adopted the master's findings and recommendations and entered the decree pursuant thereto from which the plaintiffs appeal. The decree permanently enjoins them from in any way interfering with the operation of the church and use of its property except in conformity to its constitution and by-laws and the laws of the State of Illinois.

A voluminous record reveals, in substance, that about twelve members joined in Illinois in 1944 to incorporate under the name "The Albanian Orthodox Church, St. Nicholas of Chicago." They acquired their present church building in 1947. That same year, too, they acquired a priest, Father Dode, sent them at their request by Bishop Noli of the Boston Diocese. Their constitution and by-laws were reduced to printed form in November 1950. These, by stipulation, control the present controversy. In Boston, in December 1950, a group of Albanian-Americans established the Albanian Orthodox Episcopacy, with Bishop Lipa, recently arrived from Constantinople for that purpose, appointed to the episcopate. In March 1951, the members of St. Nicholas received literature concerning Bishop Lipa and the Episcopacy. Sporadically, thereafter, they conversed upon the relative merits of the Boston Diocese and its bishop, Noli, and the Boston Episcopacy and its bishop, Lipa. The membership slowly grew until in December 1951, it numbered 65 persons. The members and officers meanwhile exchanged conflicting views with respect to the Lipa-Noli question. Many of the members and officers were dissatisfied with Father Dode, who was pro-Noli. In March 1952, the membership of the church had increased to about 204 and because of the Lipa-Noli conflict, the minority group, plaintiffs, undertook to dismiss certain defendants, members of the governing committee of the church, and a large number of members. The majority group, defendants, undertook to amend the constitution and by-laws to effect withdrawal of the church from the Diocese, removal of Father Dode, and connection with the Episcopacy. Both groups have organized themselves as the self-constituted St. Nicholas Church of Chicago. No fundamental difference in church doctrine exists between them or between the Diocese and Episcopacy.

Plaintiffs make several principal contentions as grounds for reversal. First, they attack the courts' jurisdiction to entertain this controversy on the ground that the master and the trial court, which adopted the findings and conclusions of the master, assumed jurisdiction based on "discussions off the record [that] . . . in maintaining church functions there have been indications of violence." This, they contend, violated the constitutional requirement of due process of law that all proceedings be open and notorious and in the presence of all parties, and violated, too, the constitutional guarantees accorded voluntary religious societies against state interference. Second, they contend that there was evidence of an agreement between the Boston Diocese and St. Nicholas Church whereby St. Nicholas became a part of a national ecclesiastical organization. Third, they contend that the court has no jurisdiction to review the expulsion of church members in the absence of a showing that civil or property rights have been violated or threatened. Fourth, they contend that the master's finding that the plaintiffs failed to establish a conspiracy is contrary to the manifest weight of the evidence.

██ Our jurisdiction arises from the conflicting claims to church property. While religious organizations enjoy the guarantee of the Fourteenth Amendment with respect to state action which violates the First Amendment (*Kedroff v. St. Nicholas Cathedral,* 344 U. S. 94, 115), still like other voluntary associations for benevolent or charitable purposes, their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. *Watson v. Jones,* 13 Wall. (80 U. S.) 679, 714. See also *Kedroff v. St. Nicholas Cathedral, supra,* 113–5, 122; *Engel v. Walsh,* 258 Ill. 98, 103.

Plaintiffs on this point challenge the decree finding that St. Nicholas Church at no time became a part of

520

the Boston Diocese, that is, of a national ecclesiastical and jurisdictional religious association. They point to Articles II and VII of St. Nicholas' constitution and by-laws, wherein, respectively, St. Nicholas "recognizes as its head (Ecclesiastical Jurisdiction), the Diocese of the Albanian Orthodox Church of America," and "Any Albanian man or woman who is eighteen years of age or over and accepts and abides the Christian Orthodox Religion of the Eastern Orthodox Church, its Canons, Laws, Discipline, Ecumenical Synods, Governing, Constitution and By-Laws of this Church, and the Albanian Orthodox Diocese in America, may become a member of St. Nicholas Church." Too, they point to the prayer and hymn books used by St. Nicholas and obtained from and translated by Bishop Noli of the Boston Diocese; the annual contributions, and the proceeds from the Christmas and Easter special offerings, donated by the membership of St. Nicholas to the Diocese; finally, the representative sent by St. Nicholas to the annual conference of the Diocese at Boston in 1951.

The court in its conclusions placed principal reliance upon (1) the provision of Article XIII that, "The Constitution and By-Laws may be added to or amended according to the need in the future"; (2) the minutes of the numerous meetings prior to 1952 when the old timers voted to attempt to hire another priest without consulting Boston. There is, in addition, a letter of 1947 from St. Nicholas to Bishop Noli which, although requesting him to recommend a priest, indicates strongly that the request was made only because the two enjoy a common religious belief and language, and because of his obvious position with respect to finding and recommending a priest of Albanian extraction who could conduct St. Nicholas' services in the mother tongue. Beyond this, there was available to St. Nicholas in the language of the constitution of the Boston

521

Diocese a clear manner of expressing its allegiance by "sending to the Council of the Diocese a list of its members, with a statement of its organization signed by its secretary, and evidence of its ability to support a priest." Besides the bare allegation contained in the complaint (denied by the defendants in their answer), there is no evidence in the record that this was in fact done. Finally (3) the court relied on the fact that although there is and has been in Illinois a method of incorporating so as to indicate a church's adherence to a higher or national church organization (Ill. Rev. Stats., ch. 32, pars. 176–186 [Jones Ill. Stats. Ann. 32.269–32.279]), St. Nicholas has not been so incorporated.

Plaintiffs cite numerous cases, among them *Church of God, Decatur, Illinois v. Finney,* 344 Ill. App. 598; *Ferraria v. Vasconcelles,* 23 Ill. 403; *Christian Church of Sand Creek v. Church of Christ of Sand Creek,* 219 Ill. 503; *Kuns v. Robertson,* 154 Ill. 394; and *Kedroff v. St. Nicholas Cathedral, supra,* in support of their contention that the defendants by their attempted amendment of the constitution and by-laws to provide for the hegemony of the Albanian Episcopacy, against the will of the plaintiffs and other members of the church, and in violation of its constitution and by-laws, withdrew themselves from St. Nicholas and forfeited their membership. It is true that property held in trust for the benefit of a particular religious denomination, or rather for the inculcation of certain defined religious tenets, cannot be held subject to be conveyed away or improved and used in accordance with the dictates of a society or congregation. *Calkins v. Cheney,* 92 Ill. 463, 477–8. Under these circumstances, members repudiate them at the risk of effecting their voluntary withdrawal, whether a minority or majority, and the property remains with those adhering to the original denomination or tenets. *Ferraria v. Vasconcelles,*

*supra.* In none of the cases cited by the plaintiffs, however, is there considered language and provisions such as we find before us in the constitution and by-laws of St. Nicholas.

██ Most obviously property held in trust for the use of a society or congregation demands that the wishes of the society or congregation with respect to its use and disposition be regarded. The society or congregation alone exercises discretion; it alone acts in obedience to its own sense of what is needful and proper now and in the future. The sole restriction imposed is, not that its rules and regulations shall conform to the canons of the church with which the society or congregation *professes* connection, or subject to the supervision and control of any body of persons representing such church, but simply that they shall not be inconsistent with the constitution and laws of this State or of the United States. *Calkins v. Cheney, supra,* at 477–8. In Article VI of St. Nicholas' constitution and by-laws is found the following language:

"The wealth of St. Nicholas Church, real or personal, for the spiritual needs of our congregation, are the following:

". . .

"The wealth of the Church, real or personal, concerns all the members of the church in which they are represented by the Committee in every case. *The committee of the Church has no authority or power to sell or to buy, neither to build nor to change important acquisitions or belongings before receiving the authorization of the members at a general meeting.* (Italics ours.)

"Any property of St. Nicholas Church, real or personal, will be fully governed according to the Laws of the Religious Corporations of the State of Illinois, and other Religious Laws of the United States of America."

523

Again, in Article XI:

"Should it so happen that sometime in the future it will be impossible to maintain the St. Nicholas Church, the Board and the Committee of that time, *with the understanding of the members,* (italics ours) will communicate with the Diocese for the disposition of the property, real or personal and for other matters concerning the Church."

■■ Circumstances precisely opposite obtained in the case of *Church of God, Decatur, Illinois v. Finney, supra,* cited by plaintiffs, where deeds to church property provided for gift over to the Board of Extension of the parent church upon certain contingencies. While it is apparent from Articles II and VII, heretofore discussed, that the congregation of St. Nicholas by their compact elected to look to the Boston Diocese with respect to certain of its practices, it was nevertheless its agreement, to which the Diocese had not been or become a party. If by sufferance the Boston Diocese tolerated this liaison, it did not thereby legally gain for itself rights in the disposition, use and control of St. Nicholas' property. Part and parcel of the congregation's compact was the right of a majority to amend the constitution and by-laws. The members of St. Nicholas upon becoming members agreed to abide by the various provisions of the constitution and by-laws. These included Article XIII. They consented to such changes in the future as the church should lawfully make. See Zollman, American Church Law (1933) 197–8. That right and power of amendment is by the express language of Article XIII absolute and unqualified. It is restricted by nothing found in the constitution and by-laws, and represents the congregation's clear and unambiguous intent to retain complete control over its property and government. As stated in the case of *Dubs v. Egli,* 167 Ill. 514, at 519, "Inasmuch as the property thus belongs to the society or congregation,

its ownership will continue in the majority of the society or congregation, when a minority secede and set up a separate organization."

Plaintiffs contend that the court concluded that the failure of St. Nicholas Church to incorporate under paragraphs 176–186, ch. 32, Ill. Rev. Stats. [Jones Ill. Stats. Ann. 32.269–32.279], providing for and governing the incorporation of religious societies as part of a general or national church, negatived any idea of connection or association with a higher or parent church and judicatory. Paragraphs 164–175 of the same chapter [Ill. Rev. Stats. 1953, ch. 32, §§ 164–175; Jones Ill. Stats. Ann. 32.257–32.268] provide the alternative method of incorporating as an independent church society. While nothing exists in the record to indicate which, if any, of the two methods was used by St. Nicholas, nevertheless the absence of a showing that it incorporated under paragraphs 176–186 was properly weighed along with all other evidence in the record. It was cumulative, not decisive.

Plaintiffs next contend that we have no jurisdiction to review the validity of the expulsion of certain officers and members of the church in the absence of a showing that civil or property rights have been violated. The only showing exists outside the record. They thus seek to invalidate the amendments voted by the members, many of whom, purportedly, had been previously expelled. Members expressly or impliedly agree to abide by the rules and regulations of the voluntary association. *Bostedo v. Board of Trade,* 227 Ill. 90. In the absence of violations of civil or property rights, the association will be left free to enforce its own rules and regulations as it sees fit. *Stallings v. Finney,* 287 Ill. 145. Our jurisdiction, as we earlier stated, arises from the conflicting claims to church property. See *Watson v. Jones, supra,* and cases therewith cited. We have no jurisdiction to re-

525

view the exercise of authority, in the absence of violations of civil or property rights. We do, however, have jurisdiction to review the facts to determine if an exercise of authority exists, and whether, in effect, plaintiffs or defendants represent the lawfully constituted St. Nicholas Church of Chicago and whether plaintiffs or defendants will be permitted to exercise the rights they possess by virtue of their voluntary compact, free from the interference of the other.

It was found that begining in 1952, and following the usual elections held in December 1951, and January 1952, for the board and committee, various movements and activities stirred the congregation, the committee and board. Between February 24 and March 16 various informal meetings of the committee and board were held in attempts to get the feuding factions together. On March 7, plaintiff Mark Ginossi, president of the committee and ex-officio member of the board, notified the board members by telegram of a March 8 meeting "for the purpose of deciding matters for the welfare of said corporation." The court found the evidence sharply conflicting as to what happened at the March 8 meeting. The board discussed Bishops Noli and Lipa. Plaintiffs claim that by a formal vote of 4 to 2 (Michaels, Tito, Nako, Ginossi for, the two Sutters against, and Vasil abstaining) the board agreed to dismiss committeemen Dimas, Samatos and Koltse and 50 or 60 members of the church. Defendants contend there never was any discussion about dismissing anyone and certainly no vote upon it. It was found that the weight of the evidence supported defendants' contention because of the testimony of the chairman of the board, Leo Michaels. Mr. Michaels is neither a plaintiff nor a defendant, but is one of the countercomplainants. There was nothing in his testimony to indicate malice. It is without undue bias, without distortion, straightforward and clear. He is one

526

of the church's original members, chairman of the board for four or five years, past president of the committee and evidently devoted to the welfare of the church. He has been active in attempting to reconcile the parties. He testified that the meeting was merely an informal gathering. He did not preside as he would at a formal meeting. He also denied that the dismissal of three committeemen and a large group of members was discussed or voted upon, or that any minutes were taken during the meeting. Ginossi, he testified, called him as he was leaving and asked him to sign what Ginossi said were minutes and he signed without looking at them. He thinks the minutes of the meeting were added after he signed. The exhibit (plaintiffs') was not introduced but the master felt that it bore out Michaels' contention. Here, where much of the evidence was conflicting, and the credibility of the witnesses of the utmost importance, we would not be justified in reversing the master, who saw and heard the witnesses, and the court that adopted his findings after a full hearing. *Zeta Bldg. Corp. v. Garst*, 408 Ill. 519; *Church of God, Decatur, Illinois v. Finney, supra.*

Plaintiffs finally contend the finding that they failed to establish a conspiracy is against the manifest weight of the evidence. They point to the fact that defendants formed a committee and organized the church members to amend the constitution and by-laws of St. Nicholas, drafted and circulated a petition for that purpose; that most of them are in some way related by marriage; many of them were instrumental in recruiting many new members in January and February 1952; a large number of those who signed the petition were new members; many of them were active in circulating the petition; the membership, while previous to December 1951, never exceeding 65 persons, suddenly swelled until in March 1952, it totalled 204 persons. Of the 124 members at the March 16, 1952 meeting called by the

527

committee (Ginossi and Gjerko, plaintiffs, refrained from voting) to amend the constitution and by-laws, only 40 or 45, plaintiffs contend, were old members. They further charge that acts of misrepresentation occurred in obtaining signatures to the petition.

It was found that many of the defendants were members of long standing; that of the thirteen officers of the board and committee nine are either defendants or support the position of defendants in their counter-complaint. By Article VIII, "members of the Committee are always obligated to . . . take in new members, . . . find ways and means to enrich the treasury . . . ." At a sort of get-together meeting in January 1952, following the December 1951, and January 1952 elections, the various new members of the board and committee were exhorted by the president (Ginossi, plaintiff) and other officers to bring in new members so that the church membership might be built up. Subsequently, in January and February 1952, about 80 individuals paid dues into the church and had their names inscribed by Foto Gjerko (treasurer, plaintiff) in his records as members of the church, in accordance with Article VII. In March 1952, the membership was approximately 204. The reasons for this sudden influx were explainable on the testimony of certain of the new members—some of them, although at all times sympathetic, had waited to see that the church would become firmly established before joining; others had not liked the political leanings of some of the officers of the years preceding 1952; a good many had participated in church social affairs, attended special services at Easter and Christmas and made special contributions to the church; still others had been members before, had dropped out and now were rejoining.

 Ginossi and Vangel did not attend the general meeting of March 16, 1952, called to amend the constitution and by-laws. Notices dated March 9 of a general

528

meeting for March 16 for the purpose of amending the constitution and by-laws were sent out by the secretary, Proyce. While the testimony of one or, possibly, two of the more illiterate and inarticulate members might seem to indicate that they did not know what they were signing at the time the petition was circularized, this circumstance was not general. Moreover, the question of amending the constitution and by-laws was clearly pointed up in the notices setting the date for the general meeting, and was again fully, fairly and clearly discussed at the meeting before balloting. The meeting chairman explained that persons favoring Lipa should vote "yes," those Noli, "no." Appointed tellers counted and announced the vote—120 yes, 2 no, and 2 abstaining. The votes were sealed and attested by the tellers. On the whole, the record supports the master's finding and conclusion, which the court adopted after a full hearing, that no conspiracy existed. See *Zeta Bldg. Corp. v. Garst, supra; Church of God, Decatur, Illinois v. Finney, supra.*

 Other contentions are made by the plaintiffs, among them the right of the women members to vote. These have no merit. We therefore affirm the order and decree appealed from which permanently enjoins plaintiffs from in any way interfering with the operation of St. Nicholas Church except in conformity to its constitution and by-laws and the laws of the State of Illinois.

*Order and decree affirmed.*

SCHWARTZ, P. J., concurs.

TUOHY, J., took no part.