**Serbian Eastern Orthodox Diocese for United States of America and Canada, etc., et al., Plaintiffs-Appellees, v. Firmilian Ocokoljich, et al., Defendants-Appellants.**

**The Right Reverend Bishop Firmilian Ocokoljich, et al., Plaintiffs-Appellants, v. Dionisije Milivojevich, Defendant-Appellee.**

**Gen. No. 65–40.**

Second District.

April 7, 1966.

Supplemental opinion September 7, 1966.

Rehearing denied September 7, 1966.

445

■■■■■■■■■■■■■
■■■■■■■■■■■■■
■■■■■■■■■■■■■
■■■■■■■■■■■■■

Raymond, Mayer, Jenner & Block, Katz and Karacic, and John J. Crown, all of Chicago, and Henry D. Fisher, of Waukegan, for appellants.

Snyder, Clarke, Dalziel, Holmquist & Johnson, of Waukegan, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

This appeal involves two actions—consolidated in the trial court—which narrate a dispute over the control of the Serbian Eastern Orthodox Diocese for United States and Canada, and the property and assets of this Diocese, and of a related institution. The trial court determined this matter by granting a summary judgment in one suit, and granting a motion to dismiss in the other. The judgment and order were based upon extensive pleadings, depositions and affidavits. Because of the summary presentation and the conflicting representations of the parties, the factual background necessary to an understanding of the case, is not in all respects certain.

We will relate the church and corporate histories, and the church and corporate laws of the institutions involved, as best we comprehend them under the posture of this appeal, in that such background is essential to an understanding of the issues involved in these pleadings.

In California and Pennsylvania in the 1890's, Americans of Serbian descent formed completely autonomous

religious associations. In 1917, these Serbian church societies became associated with the Russian Orthodox Church which sent Father Mardarije Uskokovich to this country to organize an "independent" Serbian Diocese in America.

In the 1920's, the Diocese in this country became affiliated with the Serbian Orthodox Church of Yugoslavia. This Diocese was incorporated in 1927 under the laws of the State of Illinois, as a religious society, under the name of "Serbian Orthodox Diocese Council for United States and Canada." It duly adopted a Constitution, which was approved by the Serbian Orthodox Church of Yugoslavia.

This charter was permitted to lapse, and in 1935, a new religious society was again incorporated under the laws of the State of Illinois, and was called "Serbian Eastern Orthodox Diocese for United States of America and Canada." Its Constitution was substantially the same as that of the first corporation and it was likewise approved by the Serbian Orthodox Church of Yugoslavia.

The Holy Bishops Assembly of the Serbian Orthodox Church, Yugoslavia, elected Dionisije Milivojevich as Bishop in 1938, and the following year appointed him as Bishop of the Diocese in this country. When King Peter II of the Kingdom of Yugoslavia was deposed by the Communists in 1944, Bishop Dionisije became concerned that efforts might be made by the Communist government to obtain control of the property of the Diocese in this country. Consequently, this religious corporation, acting through its Diocesan Council, which is hereafter more fully defined, adopted a resolution calling for the incorporation—under the general not-for-profit corporate laws of the State of Illinois—of a separate corporation, to which the assets of the religious corporation would be transferred and in which the title to the various assets would be held. Such a corporation was formed in the year 1945 under the name "Serbian Orthodox Monastery of Saint Sava."

Before completing this chronology, we will briefly relate the relevant portions of the Constitutions and By-laws of the Serbian Orthodox Church; of the Serbian Eastern Orthodox Diocese for the United States of America and Canada, the religious corporation; and of the Serbian Orthodox Monastery of Saint Sava, the not-for-profit corporation.

The Constitution of the Serbian Orthodox Church (with its headquarters in Belgrade, Yugoslavia) sets forth that the Serbian Orthodox Church is autocephalous, and governs and regulates independently, all of its religious affairs; and that it has the rank of a Patriarchate and maintains dogmatic and canonical unity with all other Orthodox Churches. It provides that the Church is episcopal with the main administrative divisions "composed of dioceses, both in regards to church hierarchical and church administrative aspect."

Article 10 provides that there are the following church hierarchical and administrative authorities, bodies and organs:

> "1. Patriarch, Holy Bishop's Council and Holy Synod, High Ecclesiastical Court, Patriarchal Council and Patriarchal Board;
> "2. Diocesan Bishop, diocesan ecclesiastical court, diocesan council and diocesan executive board;
> . . . ."

Additional authorities at a level below the dioceses are then set forth which are not pertinent to this decision.

It is provided in Article 12:

> "The Serbian Orthodox Church is epsicopal. Its main administrative division is composed of dioceses, both in regard to *church hierarchical and church administrative aspect.*" (Emphasis ours.)

Article 13 provides in part:

449

"At the head of each diocese there is the diocesan bishop as its direct ruler. He is, according to the church canonical regulations, chief representative and guiding leader of all church spiritual life and church order in the diocese and he rules the diocese assisted by his clergy and laymen."

Article 14 reads: "These are the Dioceses in the Serbian Orthodox Church . . . ." It then lists a number of dioceses, all located within Yugoslavia. Article 15 provides that in addition to the dioceses previously named, there are additional dioceses outside of Yugoslavia "under the jurisdiction of the Serbian Orthodox Church *in spiritual and heirarchical aspect."* (Emphasis ours.) Among those listed is the Serbian Orthodox Church in the United States of America and Canada. Article 16 provides that "Decisions of establishing, naming, liquidating, reorganizing, and the seat of dioceses . . . is decided by the Holy Council of Bishops, in agreement with the Patriarchal Council." For the reasons hereinafter stated, we believe that Article 16 applies only to those dioceses of the Serbian Orthodox Church which are under its jurisdiction in both church hierarchial and church administrative aspects.

Next, in the body of private laws governing the institutions before the court, is the Constitution of the Diocese. It states that the Diocese "is considered ecclesiastically —judicially as an organic part of the Serbian Patriarchate in the Kingdom of Yugoslavia." Article 2 provides that "All statutes and rules which regulate the ecclesiastical—canonical authority and position of the Serbian Orthodox Church in the Kingdom of Yugoslavia are also compulsory" on the Diocese "with the exception of specific cases which must be formulated with regard to local circumstances in accordance with ecclesiastical and judicial principles."

Article 3 of this Constitution provides that the jurisdiction of this Diocese includes the entire political territory of the United States and Canada, which by its geographical location enjoys "full administrative freedom" under which "it can independently regulate and rule the activities of its church, schools and other diocesan institutions and all funds and beneficiences, through its organs, but in accordance with the laws of this constitution and in agreement with the laws of the United States of America and Canada." The highest legislative and administrative authority of the Diocese is the Diocesan National Assembly; its executive and administrative organ is the Diocesan Council. The Diocesan Assembly is opened by the Diocesan Bishop. One of its functions is to make changes and amendments to the Constitution "with the approval of the Holy Bishop's (sic) Assembly of the Serbian Patriarchate."

Article 9 provides that the Bishop of the diocese shall be appointed by the Holy Assembly of Bishops of the Serbian Patriarchate. Article 13 specifies that when the seat of the Diocese Bishop is vacated, the administration of the Diocese, in spiritual and administrative matters, shall be upheld by the Diocesan Ecclesiastical Court and Diocesan Council until an administrator is appointed "by the Serbian Patriarch with the Holy Poantifical Synod." Article 14 provides that the Diocesan Bishop is the supreme head of the St. Sava Monastery in Libertyville and that he appoints the abbot of the monastery and "conducts the canonical supervision and the higher executive authority over the monastery."

Article 149 provides that the property owned by the Diocese is "to serve exclusively for the purpose designated by the statutes of this Constitution and cannot be used for any other purpose." Article 155 provides that the Diocesan Fund consists of "all funds and assets which the Serbian people of the entire Diocese, individually or

451

collectively through their church-school congregations and other various societies and organizations should establish, increase and dedicate to the mutual necessities of its church and school for the religious and educational aims of the entire Diocese." It further provides that the Diocesan Fund is to be supervised by the Diocesan Council. Article 156 provides that all real estate and personal property of the St. Sava Monastery in Libertyville is supervised by the monastery's administration "under the direct control of the Diocesan Bishop."

The Bylaws of the Serbian Orthodox Monastery of Saint Sava—the not-for-profit corporation formed in 1945—provide that it is an autonomous Serbian Church institution; and further provide that the corporation "possesses its own property which cannot be disposed of, sold, mortgaged or otherwise conveyed by any Serbian Church authority, without the consent and approval of the Diocesan Council, headed by the Bishop and the Dioceson Church conventions."

Article V provides that the Diocesan Bishop, "received as such by the Diocesan Council, by the Diocesan Church court and by the Diocesan Convention, is the supreme head of the Monastery and is the general overseer according to the Holy Canons of the Church. (By-Law 156 of the Diocese.)" Article VI of the Bylaws provides that the "president of the Board of Directors shall be the canonical Bishop of the Diocese, received as such by the Diocesan Council, by the Diocesan Church Court and by the Diocesan Convention."

With the above Constitutions and corporate histories in mind, we considered the following chronology of events: On May 10, 1963, the Holy Episcopal Synod of the Serbian Orthodox Church of Yugoslavia suspended Bishop Dionisije, and at the same time appointed Firmilian Ocokoljich as administrator of the Diocese; on May 17, 1963, its Holy Episcopal Council disbanded the American-Canadian Diocese and in its place established three new Dioceses,

452

which extended beyond the borders of the United States and Canada and included South Africa and South America; and on said latter date, the Holy Episcopal Synod appointed Firmilian Ocokoljich, Gregorije Udicki and Stefan Lastavica as temporary administrators of the respective Dioceses. The Holy Bishops' Council, on July 27, 1963, discharged Bishop Dionisije as Diocesan Bishop and elected Bishop Firmilian as Diocesan Bishop in his place. It is significant that Bishop Firmilian was not elected as Bishop of the Serbian Orthodox Diocese Council for United States and Canada, but rather was elected as Bishop of one of the three newly created Dioceses. The other two temporary administrators were likewise each respectively elected as a Bishop of one of the other two newly created Dioceses.

The Diocesan National Assembly adopted a resolution declaring the division of the Diocese into three Dioceses, to be unlawful and unconstitutional, and refused to recognize the suspension of Bishop Dionisije or the election of the other three Bishops. The Holy Bishops' Synod of the Serbian Orthodox Church responded by declaring the Diocesan National Assembly unlawful. In reply to this, the Diocesan National Assembly, at an adjourned meeting held in November, 1963, passed amendments to the Diocese Constitution, declaring the autonomy of the Diocese and its freedom from all control of the Patriarchate in Belgrade. These amendments were not submitted to the Holy Bishops' Assembly for approval. On March 15, 1964, the Holy Episcopal Council, comprised of the Patriarch, Metropolitan and Diocesan Bishops of Yugoslavia defrocked Bishop Dionisije.

The appellees, referred to herein as the "Dionisije faction," brought the first suit in the names of the religious and not-for-profit corporations against the three Bishops of the new Dioceses, appellants, referred to herein as the "three Bishops faction," praying that none of the defendants be permitted to interfere with the ad-

ministration of the properties of the plaintiff corporations. The "three Bishops faction" brought the second suit praying that the court find that Bishop Dionisije had been removed as Bishop; that the three Bishops be found to be lawfully appointed and be permitted the use of all the Diocesan properties; that only those members of the Church, who recognize the three Bishops, be acknowledged as members of the Serbian Orthodox Church for the Diocese of the United States and Canada; that the two corporations be found to hold their assets in trust for members of the Serbian Orthodox Church residing within the Dioceses, and for other similar relief. As indicated, the trial court consolidated these actions, considered the pleadings, depositions and affidavits, and granted the "Dionisije faction" summary judgment on their complaint and granted their motion to dismiss the complaint of the "three Bishops faction."

The appellants contend that the issue before this court is simply whether they or the appellees, are entitled to exercise the religious authority of the Serbian Orthodox Church in this country. Appellants assert that only ecclesiastical matters are involved, and the appellees urge that only the property rights of Illinois corporations are embraced in this litigation.

We believe that both contentions are correct, in part. While both factions claim the right to control the properties and assets held by the Illinois corporations, neither the religious nor the not-for-profit corporation may claim title to or use of the assets free of trust or use for the benefit of the members of the Diocese. The determination of the disputed right to control such properties and assets cannot be made solely by resolving the question of title or the exercise of corporate authority under the Illinois corporate laws.

Article 155 of the Constitution of the Diocese imposes a trust upon the use of the Diocesan Fund and Article

149 further limits the use of the property "to serve exclusively for the purpose designated by the statutes of this Constitution and cannot be used for any other purpose." Section 46f of the Religious Corporations Act (Ill Rev Stats 1963, c 32, par 181) further imposes such a trust, which arises by operation of law in the absence of a declaration of trust or use in the gift, devise or grant in the instrument giving the property to the Church.

By the same token, the resolution of the Diocesan Council calling for the creation of the not-for-profit corporation to which the assets of the Diocese were to be transferred, can only have validity if this trust is likewise to follow the assets into the hands of this corporation and govern the administration of such assets. The creation of the Serbian Orthodox Monastery of Saint Sava, pursuant to the resolution of the Diocesan Council, is consistent with the degree of autonomy and administrative freedom reserved by the Diocese unto itself in Article 3 of the Constitution which provides that "it can independently regulate and rule the activities of its church, schools and other diocesan institutions and all funds and beneficiences, through its organs." The bylaw of the not-for-profit corporation providing that its property "cannot be disposed of, sold, mortgaged or otherwise conveyed by any Serbian Church authority without the consent of the Diocesan Council, headed by the Bishop and the Diocesan Church conventions" is not inconsistent with either the trust imposed or the Constitutional requirements of the Diocese.

■ It is within the framework of these organizational laws that this dispute must be resolved. The protection of the law extends to religious associations the same as to other voluntary associations of benevolent or charitable purposes. The rights of property or other civil rights of such associations are equally under the protection of law, and the actions of their members, subject

455

to its restraints. Ginossi v. Samatos, 3 Ill App2d 514, 520, 123 NE2d 104 (1st Dist 1954).

In Watson v. Jones, 13 Wall 679 (1871), 20 L Ed 666, the United States Supreme Court set forth the three categories of cases which have come before the courts pertaining to the rights of property held by ecclesiastical bodies, namely: (1) When the property, by the express terms of the instrument under which it is held, must be devoted to some specific form of religious doctrine or belief; (2) When the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority; and (3) Where the ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme judicatory over the whole membership of the general organization.

The Supreme Court in Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America, 344 US 94 (1952) at page 110, 97 L Ed 120, 133, 134, also defined the third group—the hierarchical churches—as those organized as a body with other churches having similar faith and doctrine, with a common ruling convocation or ecclesiastical head. We do not believe it can seriously be contended that the American Diocese is not a part of such a hierarchical structure. The constitutions referred to above abound with references to the hierarchical framework, with the Serbian Orthodox Church as the General Church. The Church history indicates this is so, and the manner of incorporating the Diocese in this country further evidences this fact.

There are two methods of incorporating religious societies under the Illinois Religious Corporations Act: sections 35–46 inclusive of the Act provide for the incorpo-

ration of independent church organizations (Ill Rev Stats 1963, c 32, pars 164–175, incl.) ; and sections 46 (a)–(k) inclusive, provide for the incorporation of any church organization which is "under the patronage, control, direction or supervision of any ecclesiastical body, diocesan or like ecclesiastical officer . . . ." (Ill Rev Stats 1963, c 32, pars 176–186, incl.) The Diocese in this country was incorporated in 1935 under the latter provisions. This fact, together with the constitutional language, church history and practice, clearly establishes the hierarchical nature of the Serbian Orthodox Church. Ginossi v. Samatos, supra, at 525.

■ ■ In disputes involving churches, hierarchical in nature, the secular courts must accept the decisions of the ecclesiastical judicatories within the structure, as to questions of discipline, faith or ecclesiastical rule, custom or law. If a civil right depends upon an ecclesiastical matter, the civil court must take the ecclesiastical decisions as it finds them. Watson v. Jones, supra; Ferraria, et al. v. Vasconcellos, et al., 31 Ill 25, 46 (1863). It is only where the decision of a church tribunal is tainted with fraud, collusion or arbitrariness that the decision need not be accepted by the secular court. Gonzalez v. Roman Catholic Archbishop of Manila, 280 US 1, 16, 17 (1929), 74 L Ed 131, 137.

The appointment and removal of a Bishop is clearly a canonical act. Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church of North America, supra; Gonzalez v. Roman Catholic Archbishop of Manila, supra. We may not alter what was done by the ecclesiastical governing authorities in this respect. It is clear that the Diocese recognized the right of the Serbian Patriarchate in this regard by providing in Article 9 of its Constitution that its Bishop shall be appointed by the Holy Assembly of Bishops and by recognizing in Article 2, the ecclesiastical-canonical authority of the Serbian Orthodox Church in the Kingdom of Yugoslavia. We must in

this regard accept the ecclesiastical determination that Dionisije is not the Bishop of the Serbian Eastern Orthodox Diocese for the United States of America and Canada.

■ We do not accept that it must necessarily follow, however, that the action of the Serbian Orthodox Church in dividing this Diocese into three new Dioceses, and changing its boundaries, and in appointing Bishops for the three supposedly new Dioceses, is proper. We find that there was manifested in the Constitution of the Diocese a very evident intent to retain autonomy and independence in the administration of its affairs while accepting the ecclesiastical-canonical authority and position of the Serbian Orthodox Church of Yugoslavia. Thus, Article 2 provides that the Diocese is considered ecclesiastically-judicially as an organic part of the Serbian Patriarchate. It does not state that the Diocese is considered as a part of the Patriarchate administratively. Article 3 provides that the Diocese is to enjoy *full administrative freedom* within the entire political territory of the United States of America and Canada, under which "it can *independently regulate and rule* the activities of its church, schools and other diocesan institutions and all funds and beneficiences, through its organs, but in accordance with the laws of this constitution and in agreement with the laws of the United States of America and Canada."

Further, the Diocese did not surrender to the Serbian Patriarchate the power to alter or change its basic governing law—its Constitution. The Serbian Patriarchate was not given the power to initiate changes in the Diocesan Constitution, but was only given the power to approve changes to the Constitution introduced and adopted by the Diocesan Assembly. It is inconceivable to us that the Serbian Patriarchate, which is denied the express power to alter or amend the Constitution of the Diocese,

458

has the implied power to totally revoke and abrogate this constitution by decreeing the Diocese to no longer be in existence. We cannot accept such conclusion and find the Constitution of the Serbian Patriarchate and that of the Diocese consistent in this regard.

█ Article 12 of the Patriarchate's Constitution provides that the Diocese is the main administrative division of the church in both the church hierarchical and church administrative aspect, and Article 14 significantly states: "These are the Dioceses in the Serbian Orthodox Church" and thereafter lists only the Dioceses within Yugoslavia. In a separate Article—Article 15—there are listed the Dioceses which are "under the jurisdiction of the Serbian Orthodox Church in spiritual and hierarchical aspect." Article 15 does not mention or specify that the Dioceses there listed are under the jurisdiction of the Serbian Church in the administrative aspect. It is there that the American-Canadian Diocese is listed. We believe that Article 16—granting power to establish, liquidate and reorganize Dioceses—applies only to those completely subordinated to the Serbian Orthodox Church, in the administrative aspect as well as in the spiritual and hierarchical aspect, as set forth in Article 12.

█ The appellees have argued that the Diocesan Assembly, as the highest executive and administrative body of the Diocese, had the power, by majority vote to amend its Constitution, and they cite Kuns v. Robertson, 154 Ill 394, 414, 40 NE 343 (1895) as authority on this point. However, in Kuns, the Constitution contained no provision—as did Article 23(8) of the Diocesan Constitution—that the highest body of the Diocese (the Assembly, in the case at bar) in amending its Constitution, must also obtain the approval of yet another society (the Holy Bishops' Assembly of the Serbian Patriarchate, in the case at bar). As we understand the appellees' position, they claim to have validly amended the Constitution in

1963 by the action of the Diocesan Assembly alone; they do not assert that they renounced its force and effect. Having failed to obtain the approval of the Holy Bishops' Assembly as required by the Constitution, the purported amendments cannot be valid.

In Lawson, et al. v. Kolbenson, et al., 61 Ill 405 (1871), the court held that the congregation could act by its majority and could not be controlled by a higher religious body—a synod. However, we must note the type of religious organization which the court had under consideration when making this pronouncement. At page 421, the court stated:

> "This church organization is unlike those of other denominations, where they can not exist at all except in subordination to a higher and controlling organization. This church had a complete legal existence, self-governing in character, before it united with any synod."

The Lawson case, like the Ginossi case, supra, both cited by the appellees, are the second type of case noted in Watson v. Jones, where the religious organization is completely independent of other ecclesiastical associations. They are not relevant to our determination.

The appellees suggest that the case of Romanian Orthodox Missionary Episcopate v. Trutza, 205 F2d 107 (CA 6th, 1953) is authority for the proposition that they had the right to amend their Constitution so as to elect their own Bishop and declare their complete autonomy. Again, the bylaws and history of the Church show that Trutza is factually inapposite. In Trutza, the sole issue was defined as the right of the Episcopate to elect its own Bishop. When enacted, the bylaws provided that the Episcopate was autonomous and had power to elect its own Bishop; and that the Episcopate maintained only spiritual and canonical unity with the Romanian Ortho-

460

dox Church. Thereafter, a Bishop obtained an amendment to the bylaws providing for the election of future bishops by the Holy Synod in Bucharest, and later the Episcopate further amended its bylaws to again restore this power to the Episcopate. It is nowhere contended in Trutza that any of the amendments were made in contravention of the provisions of the existing bylaws. Such is not the case here.

■ The appellees also rely upon the case of Russian Orthodox Greek Catholic St. Peter & St. Paul's Church of Lorain v. Burdikoff, 177 Ohio App 1, 189 NE2d 451 (CA Ohio 1962) and Ginossi, supra. In Burdikoff, the Patriarch of Moscow had long recognized the autonomy of the Metropolia in this country. The court held that the Patriarch was prevented either by laches or by estoppel from now asserting its control over the Metropolia. On the record in the case at bar, we find no such basis for asserting that the appellants are prevented by laches from asserting control. In Ginossi, the Constitution of the Diocese reserved unto the Diocese "absolute and unqualified" power to amend its constitution and bylaws. Such reservation was absent in the case at bar.

The Supreme Court in Kedroff, at page 116, in referring to the case of Watson v. Jones stated: "The opinion radiates, however, a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." This theory is applicable, however, not only to the mother religious organization, the Serbian Orthodox Church, but also to the member religious organization, the Serbian Eastern Orthodox Diocese for United States of America and Canada. In addition to being religious societies, both are constitutional societies existing within the framework of their respective bodies of law. To the extent that the

461

Diocese retained unto itself certain matters of church government by its Constitution, it is not for the Serbian Orthodox Church to usurp these functions by the pretended power of its higher hierarchical authority.

██ ██ In the last analysis it must be said that all church societies may not lend themselves precisely to the three categories set forth in Watson v. Jones, supra. As indicated in the divergence of constitutional provisions of the cases which have been before the courts, there may be varying degrees of autonomy. Where, as here, the Diocese has reserved unto itself certain powers of church administration and government, and granted unto a superior tribunal, limited powers—such as the appointment of its head and the approval of any changes in its fundamental law—those reserved powers must be protected not only from State interference, but also from interference from other ecclesiastical societies.

From the views we have expressed herein, the Serbian Orthodox Church has authority to make the ecclesiastical decisions relative to the removal and appointment of a Bishop for the Serbian Eastern Orthodox Diocese for United States of America and Canada, as well as the appointment of a temporary administrator. It exceeded its authority, however, and infringed upon the authority of the Diocese when it purported to change the geographical structure of the Diocese and eliminate its reserved administrative powers, including the control over Church properties, subject to the trust imposed thereon, by dissolving the Diocese and creating three new Dioceses.

Accordingly, the summary judgment granted by the trial court in cause No. 63–1644 is hereby reversed, as is the order dismissing the amended complaint in Cause No. 63–2313; and the causes are remanded with directions to the trial court to proceed, under proper pleading,

with a full hearing on the merits of the causes in accordance with the views expressed herein.

Reversed and remanded with directions.

MORAN, P. J. and ABRAHAMSON, J., concur.

SUPPLEMENTAL OPINION ON DENIAL OF PETITION FOR REHEARING

Plaintiffs-appellees, in their petition for rehearing, vigorously contend that the court has misapprehended certain points raised in their brief. We deem this case of sufficient significance to warrant elaborating on our opinion concerning these matters.

 Plaintiffs-appellees first contend that the opinion should be corrected to read that the Holy Episcopal Council of the Serbian Orthodox Church of Yugoslavia on May 10, 1963 purported to divide the American-Canadian Diocese into three new Dioceses, and on May 17, 1963, the Holy Episcopal Synod, in executing this decision, appointed Firmilian as temporary administrator of one of the three supposedly newly created Dioceses in place of Bishop Dionisije. This is all quite true and, as pointed out in the opinion, the Serbian Orthodox Church exceeded its authority in these respects. It was without authority to disband the American-Canadian Diocese, and it follows that the purported appointments of temporary administrators and Bishops of these supposedly new Dioceses were without validity.

This decision was, however, only one of the decisions made at the May 10 meeting. The Holy Episcopal Synod, under the date of May 17, 1963, and under No. 1725/2a p 237 and under No. 1726/2a p 238, notified Firmilian of the decision to divide the Diocese and of the facts that Dionisije was Bishop of the newly created Middle West-

ern American Diocese, and having been suspended, that he, Firmilian, was temporary administrator. Under our opinion, this notice and these decisions were likewise void.

Previously, however, under date of May 10, 1963, and under No. 1664/2a p 188, the Holy Epíscopal Synod advised Bishop Dionisije that, as of that date, it had suspended him as Bishop of the American-Canadian Diocese pending examination of the charges against him, and that it was appointing Firmilian as temporary administrator thereof in his place. In our original opinion, we held that these ecclesiastical decisions were within the power of the Holy Episcopal Synod, and, as a result, Firmilian was validly appointed temporary administrator, not of one of the supposedly new Dioceses, but of the original American-Canadian Diocese. Later Bishop Dionisije was discharged as such Diocesan Bishop.

Plaintiffs-appellees object to that part of the opinion wherein we state, "We must, in this regard, accept the ecclesiastical determination that Dionisije is not the Bishop of the Serbian Eastern Orthodox Diocese for the United States of America and Canada." They complain that appellants are quoting this sentence for propaganda purposes; that the trial court did not hold a hearing on appellants' complaint, having dismissed it; and that the appellees thus did not have to present proof of such factors as might justify a secular court in not accepting the ecclesiastical decision of a church tribunal.

Our opinion was based on the summary presentation and the conflicting representations of the parties. No testimony was taken at the trial. Consequently, it was not our intent to prejudge what might be presented to the trial court on remandment in an orderly and complete hearing of these consolidated cases on their merits. If, upon proper pleadings, competent testimony and other valid evidence, the appellees can present a case which

would warrant and justify the trial court—a civil court —in not accepting a pertinent ecclesiastical decision or decisions, we do not mean to be understood to preclude them from doing so. Our purpose in remanding the case is to afford all of the litigants a complete and full hearing on the merits pertaining to the many issues and questions involved. The factual background of this case is indeed significant, but it is not without dispute, as is evidenced by the numerous conflicting representations made to the court through extensive pleadings, depositions, affidavits, and briefs.

The legal conclusions reached in our opinion are based upon the facts as they appear to us as the case stands at this juncture. Should a full hearing develop factual matters of significance, different from those upon which this opinion is based, then our opinion would be limited accordingly.

While we have due respect for the law of judicial parsimony, we do not believe that an opinion should judicially shortchange the litigants by failing to chart a course of procedure upon return to the trial court. Such failure would aggravate, rather than aid, in the ultimate dispositon of the litigation, as well as encourage further appeals.

We will only briefly comment on the contention raised upon rehearing that the 1935 Constitution of the American-Canadian Diocese was a mere contract or compact between it and the Serbian Orthodox Church, which the latter repudiated, renounced and abandoned when it sought to dissolve the Diocese, and that thereafter the Diocese did not have to obtain approval of Constitutional amendments by the Holy Bishops' Assembly as required by the Diocesan Constitution.

To us the Constitution of the Diocese is something more than a contract or compact under which certain powers were delegated by the Diocese which could alleged-

■■■■■

ly be restored unto it upon a repudiation of the contract. We view the Diocesan Constitution, together with the Constitution of the Serbian Orthodox Church, as expressions of the fundamental laws governing the relationship and authority of these respective church organizations—which were thereby joined in certain respects in a hierarchical and episcopal structure—as distinguished from an autonomous or congregational church entity. An act contrary to such constitution is not a repudiation, permitting the Constitution to be abandoned and ignored. Such act is rather without validity, force or effect.

For these reasons, we adhere to the opinion herein as originally adopted, subject to the limitation expressly set forth above.

MORAN, P. J. and ABRAHAMSON, J., concur.